**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | |
| YISROEL MEIR LEEDER | : | |
| | : | Civil Action No. 3:18-cv-12384-BRM-DEA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | **OPINION** |
| | : | |
| MOSHE FEINSTEIN; SHLOMO | : | |
| YEHUDA FEINSTEIN; ARON | : | |
| WASSERLAUF; KASTNER'S | : | |
| MARKET; KOSHER DELIGHT LLC; | : | |
| DOUBLE DECKER DELI, LLC; | : | |
| CAPRI RISTORANTE LLC; 726 41ST | : | |
| LLC; GROUP EIGHTEEN, INC; AM | : | |
| DISPLAY DIST. Inc.; UHCS, INC; | : | |
| CARLOS & GABBY'S MIAMI; AMBER | : | |
| CAPITAL; IADVANCEU LLC; AYN OD | : | |
| MILVADO LLC; NISSIM OHAYON; | : | |
| CHAVIVIA FEINSTEIN; SAPPHIRE | : | |
| FUNDING LLC; LIAM DOE; JOHN | : | |
| DOES 1-30, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is: (1) a Motion to Dismiss Plaintiff Yisroel Meir Leeder's ("Leeder" or

"Plaintiff") Complaint (the "Complaint") filed by Defendants Shlomo Feinstein ("Shlomo")[1] and

Sapphire Funding LLC ("Sapphire") (collectively, the "Shlomo Defendants") (ECF No. 46); (2) a

---

[1] As there are several defendants sharing the last name Feinstein, for the purpose of clarity, this Court refers to each defendant by their first name. The Court intends no disrespect in so proceeding.

Motion to Dismiss the Complaint filed by Defendants Aron Wasserlauf ("Wasserlauf"), 726 41st LLC ("726 41st"), Am Display Dist., Inc. ("Am Display"), Capri Ristorante LLC ("Capri"), Carlos & Gabby's Miami ("Carlos & Gabby's"), Double Decker Deli LLC ("Double Decker"), Group Eighteen Inc. ("Group Eighteen"), Kastner's Market ("Kastner's"), and Global Delight LLC ("Global Delight") (collectively, the "Wasserlauf Defendants") (ECF No. 50); and (3) a Motion to Dismiss for failure to state a claim, or for an order referring the matter to a Beis Din,[2] filed by Defendants Chaviva Feinstein ("Chaviva") and Moshe Feinstein ("Moshe") (ECF No. 61). Leeder filed an Opposition to each of the three Motions to Dismiss. (ECF Nos. 54, 55 & 62.) Having reviewed the submissions filed in connection with the motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Shlomo's Motion to Dismiss is **GRANTED**; the Wasserlauf Defendants' Motion to Dismiss is **GRANTED**; Moshe's Motion to Dismiss in **GRANTED IN PART** and **DENIED IN PART**; and Moshe's Motion to Refer the Matter to a Beis Din is **DENIED**.

## I.    PROCEDURAL AND FACTUAL BACKGROUND

### A.  Procedural History

On August 2, 2018, Plaintiff filed the Complaint before this Court asserting: a federal Racketeer Influenced and Corrupt Organizations Act ("RICO") claim against all Defendants (Count One); a common law fraud claim against all Defendants (Count Two); a New Jersey state RICO claim against all Defendants (Count Three); a New Jersey Consumer Fraud Act ("NJCFA") claim against all Defendants (Count Four); a breach of contract claim against all Defendants (Count Five); a book account claim against all Defendants (Count Six); and an unjust enrichment claim against all Defendants (Count Seven). (ECF No. 1.)

---

[2] A "Beis Din" or a "Beth Din" is a rabbinical court of Judaism.

On November 11, 2018, Shlomo filed a Motion to Dismiss the Complaint for failure to state a claim. (ECF No. 46.) On December 23, 2018, Leeder filed an Opposition to Shlomo's Motion to Dismiss. (ECF No. 54.) On November 19, 2018, the Wasserlauf Defendants filed a Motion to Dismiss for failure to state a claim and for lack of personal jurisdiction. (ECF No. 50.) On December 26, 2018, Leeder filed an Opposition to the Wasserlauf Defendant's Motion to Dismiss. (ECF No. 55.) On January 14, 2019, Moshe filed a Motion to Dismiss the Complaint for failure to state a claim, or for an order referring the matter to a Beis Din. (ECF No. 61.) On February 1, 2019, Leeder filed an Opposition to Moshe's Motion to Dismiss. (ECF No. 62.)

### B.  Factual Background

For the purposes of these Motions to Dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to the Plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Further, the Court also considers any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

Leeder is a New Jersey resident who alleges that Moshe, along with the other named defendants, "robbed him of over $850,000 in approximately three months." (ECF No. 1 ¶ 5.) Moshe is a Florida resident who was the "ringleader of the fraudulent scheme and the individual who crafted the fraudulent schemes at work in this action." (*Id.* ¶ 6.) Shlomo, the brother of Moshe, is a New Jersey resident who is alleged to have assisted in the fraudulent scheme. (*Id.* ¶ 7.) Wasserlauf is a Florida resident who operated several businesses alleged to have been involved in the scheme. (*Id.* ¶ 7.) Leeder also brought suit against several businesses owned or operated by Moshe, Shlomo, and Wasserlauf, claiming the businesses were used to assist the fraudulent

3

scheme. These businesses include: Kastner's, Kosher Delight LLC ("Kosher Delight"), Double

Decker, Capri, 726 41st, Group Eighteen, Am Display, UHCS, Inc. ("UHSC"), Carlos & Gabby's,

Amber Capital, IADVANCEU LLC ("Iadvanceu"), Ayn Od Milvado LLC ("AOM"), and

Sapphire (hereinafter, the "Company Defendants"). (*Id.* ¶¶ 9-27.)

In April 2018, Moshe approached Leeder to invest in Moshe's purported merchant cash

advance business, which "lent funds at high and potentially usurious rates to merchants in

exchange for repayment from their credit card receipts or other accounts receivable." (*Id.* ¶ 30.) It

is unclear whether Moshe had any actual merchant cash advance business. (*Id.* ¶ 31.) Leeder

provided Moshe with over $850,000 for which he never received any return. (*Id.* ¶ 34.) Rather,

Moshe provided "various excuses which demonstrate that the entire operation was a scam and that

there was never any intention of repaying [Leeder]." (*Id.*)

Initially, Moshe solicited a $50,000 "loan," which was delivered by check to Shlomo on

April 16, 2018. (*Id.* ¶ 35.) The initial transaction "was to return the principal plus a return of 15%

within six months." (*Id.*) On April 25, 2018, Moshe emailed Leeder seeking additional funds to

finance a different transaction, and between April 27 and 30, 2018, Leeder made a series of

payments via Chase Quickpay that totaled $20,000 and "were to return 20% interest and the

principal of the investment within four months." (*Id.* ¶¶ 36-37.)

On April 29, 2018, Moshe emailed Leeder seeking further investments and promising

"collateral, excellent deals and excellent terms." (*Id.* ¶ 38.) On April 30, 2018, Leeder deposited

$25,000 in Moshe's bank account to fund the next "deal." (*Id.* ¶ 39.) Leeder's bank placed a hold

on the transaction, so Leeder sent the funds via Chase Quickpay. (*Id.*)

Between May 1 and May 11, 2018, Leeder sent Moshe another $40,000 via Chase

Quickpay for a third "deal" for which he was promised a 20% return for three months. (*Id.* ¶ 40.)

On May 14, 2018, Leeder wired Moshe $23,000 for a fourth deal that would "total $100,000 and provide a return of 30% over three months." (*Id.* ¶ 41.) Prior to this transaction, Moshe informed Leeder that he had obtained collateral from Wasserlauf in connection with several of the Company Defendants which he owned. (*Id.*) On May 18, 2018, Leeder wired an additional $45,000 to Moshe "for the transaction with Wasserlauf." (*Id.* ¶ 43.)

On May 24, 2018, Leeder sent Moshe $2,863 for a "claimed investment in Bitcoin at a return rate of 19% in one week." (*Id.* ¶ 44.) On May 25, 2018, Leeder wired Moshe $35,000 and Moshe "represented that $13,000 would be repaid by Monday, May 28[, 2018.]" (*Id.* ¶ 45.) The purpose of this payment is not specified. On May 27, 2018, Leeder sent $10,000 to Defendant AOM, a Company Defendant, which is associated with Defendant Nissim Ohayon ("Ohayon"). (*Id.* ¶ 46.) Moshe indicated to Leeder that "Ohayon would lay out money for him on credit card and Paypal transactions and that [Moshe] would pay him a fee for this service." (*Id.* ¶ 47.) On May 28, 2018, Leeder sent another $14,000 to Ohayon via Paypal "for another short term advance to [Moshe]." (*Id.* ¶ 48.)

On May 29, 2018, Moshe emailed Defendant Liam Doe, his assistant, and instructed him to wire $75,000 to Leeder and instructed Leeder to return $13,000 when he received the wire. (*Id.* ¶ 49.) Leeder never received the wire despite Moshe's insistence that it was sent. (*Id.* ¶ 50.) On May 31, 2018, Moshe informed Leeder that his bank account was frozen on suspicion of fraud and again requested Leeder provide more money. (*Id.* ¶ 52.)

On June 1, 2018, Leeder wired Moshe $12,000 after being promised that it would be repaid by June 4, 2018. (*Id.* ¶ 53.) The next day, Leeder sent Moshe an additional $2,800 via Chase Quickpay, again with a promise of repayment by June 4, 2018. (*Id.* ¶ 54.) On June 4, 2018, Moshe claimed to have sent Leeder a wire for $30,000, which Leeder never received. (*Id.* ¶ 56.) On the

5

same day, Leeder sent an additional $72,000 to Moshe, which was subsequently sent to Ohayon's

Paypal account. (*Id.* ¶ 57.)

On June 5, 2018, Leeder attempted to send another $15,000 to Ohayon via Paypal, but

Paypal did not allow the transaction to proceed. (*Id.* ¶ 59.) Therefore, Moshe "pressured [Leeder]

to provide a credit card he could charge, and [Leeder] did so for $18,000." (*Id*.) On June 11, 2018,

Leeder checked his bank statement and learned that Moshe caused $149,000 to be charged against

the card, significantly more than Leeder had permitted. (*Id.* ¶ 61.) Moshe claimed that the charges

were accidental and promised he would inform the individual incurring the charges to stop. (*Id.* ¶

62.)

On June 12 and 13, 2018, Leeder demanded that Moshe return his money, but Moshe

"deflect[ed]" the demands. (*Id.* ¶¶ 63-64.) On June 17, 2018, Moshe informed Leeder that a

merchant client of his "had obtained a refinance of $900,000" and that Moshe would be recouping

all of the money which he had taken from Leeder. (*Id.* ¶ 65.) Moshe further claimed that he was

travelling to the New York area and would hand deliver a check to Leeder for at least $400,000.

(*Id*.) Moshe indicated that he had intended to begin repaying Leeder, but could not because the

IRS froze the funds in certain accounts he owned. (*Id.* ¶¶ 66-68.)

On June 18, 2018, Moshe again began pressuring Leeder for further investments. (*Id.* ¶ 69.)

Leeder relented and sent Moshe an additional $42,000. (*Id*.) The next day, Leeder sent Moshe,

Chaviva, and Ohayon an additional $55,000 via Paypal. (*Id.* ¶ 71.) In an effort to induce Leeder to

send more funds, Moshe sent him a picture of a check made out to Leeder $120,000, which he

never received. (*Id*.)

Between June 21 and 24, 2018, Leeder disputed charges on his credit card for which Moshe

had no authorization. (*Id.* ¶ 73.) Between June 26 and 28, 2018, Moshe begged Leeder "to drop

any credit card challenges related to the payments to Ohayon, claiming that Ohayon was innocent and had nothing to do with the failure to repay" Leeder. (*Id.* ¶ 77.) Moshe then offered to pay $100,000 back via Paypal, which he would then cover via disputing charges. (*Id.* ¶ 78.) Leeder "declined to participate in this scheme, both due to its obvious illegality and the fact that it would likely not be successful." (*Id.* ¶ 78.)

Sometime thereafter, following continued pleading from Moshe, Leeder sent Moshe an additional $4,200 via Paypal to help Moshe cover his rent payments and further agreed to drop the credit card disputes as it related to charges from Ohayon. (*Id.* ¶¶ 80-81.)

On June 29, 2018, Moshe informed Leeder that he intended to start making repayments as he acquired $20,000 "from a particular deal" and would "instruct the merchant to send it direct to [Leeder]." (*Id.* ¶ 82.) Moshe instructed that, which each $20,000 repayment made to Leeder, Leeder would have to send $5,000 back "for personal and business needs." (*Id.*)   As apparent evidence of the purported deal with the merchant, Moshe provided email correspondence with Wasserlauf. (*Id.* ¶ 83.) Leeder contends Wasserlauf and his companies "were integral to the final portion of the scheme" to defraud him. (*Id.* ¶ 84.)

On July 2, 2018, Moshe deposited two checks into Leeder's account in the amounts of $34,000 and $68,000. (*Id.* ¶ 88.) Leeder returned $48,000 of the money paid to him, apparently in compliance with the deal he made with Moshe, $4,000 of which was paid to Shlomo. (*Id.*) Both of the checks Moshe then deposited into Leeder's account bounced. (*Id.* ¶ 89.)

On July 3, 2018, Moshe claimed that Wasserlauf would lend him $150,000, with $75,000 intended as a repayment to Leeder. (*Id.* ¶ 90.) "Somehow, [Leeder] had to advance the money and lay out $75,000 for [Moshe]." (*Id.*) Leeder then transferred $75,000 to Moshe and Ohayon. (*Id.*) On July 4, 2018, Leeder sent an additional $48,000 to Ohayon and $21,500 to Moshe. (*Id.* ¶ 91.)

Leeder does not specify a purpose for these payments other than to note that Moshe requested them as his "Paypal was frozen and [he] needed those funds." (*Id*.) On July 5, 2018, Moshe again claimed to have borrowed $65,000 from Wasserlauf, for which Leeder would be required to pay $40,000. (*Id.* ¶ 92.) Leeder paid the amount to Moshe and Ohayon via Paypal. (*Id*.)

On July 6, 2018, Leeder emailed Wasserlauf inquiring about the funds and never received a response. (*Id.* ¶ 94.) On July 9, 2018, Leeder received a call from an individual claiming to work for Wasserlauf who informed him that the "transactions were not authorized and [were] reported as fraud." (*Id.* ¶ 95.) On July 10, 2018, Leeder ceased communications with Defendants and challenged the credit card transactions which he believed he had a basis to challenge. (*Id.* ¶ 96.) Leeder calculates that he lost $864,686 in funds advanced and transactions fees to Paypal. (*Id.* ¶ 99.) Leeder has not received any of the returns he was promised. (*Id*.)

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual

allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a

court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *Burlington Coat Factory*, 114 F.3d at 1426 (quoting *Shaw*, 82 F.3d at 1220).

### B.  Federal Rule of Civil Procedure 9(b)

Fraud based claims are subject to a heightened pleading standard, requiring a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). For a fraud-based claim, a court may grant a motion to dismiss pursuant to Federal Rule of Civil Procedure 9(b) if the plaintiff fails to plead with the required particularity. *See Frederico v. Home Depot*, 507 F.3d 188, 200-02 (3d Cir. 2007). The level of particularity required is sufficient details to put the defendant on notice of the "precise misconduct with which [it is] charged." *Id.* at 200 (citation omitted). At a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany the first paragraph of any newspaper story – that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (citation omitted). The heightened pleading standard set forth in Rule 9(b) applies to causes of action asserted pursuant to RICO claims, the New Jersey Consumer Fraud Act ("NJCFA"), and common law fraud claims. *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 524 (D.N.J. 2008) (applying Rule 9(b) to NJCFA and common law fraud claims). To satisfy the specificity requirement of Rule 9(b), the pleadings must state: (1) what the misrepresentation was; (2) what was purchased; (3) when the conduct complained of occurred; (4) by whom the misrepresentation was made; and (5) and how the conduct led plaintiff to sustain an ascertainable loss." *Smajlaj v. Campbell Soup Co.*, 728 F. Supp. 2d 84, 104 (D.N.J. 2011).

### III. DECISION

As there are three separate Motions to Dismiss pending before this Court from the various Defendants, this Court will address the arguments raised in the Motions to Dismiss by issue and cause of action.

#### A. Motion to Refer the Matter to a Beis Din

Moshe argues this Court should stay this matter pending the outcome of the administrative proceedings and refer this matter to a Beis Din "since all the individual parties to the action are Orthodox Jews, and the companies who are named defendants are owned by Orthodox Jews." (ECF No. 61 at 5-8.) In support of this contention, Moshe almost exclusively cites religious law – much of it in Hebrew – which is not binding on this Court. In fact, Moshe cites only one case, *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398 (1982) for the proposition that "a party must exhaust [] administrative remedies before suing in court." (ECF No. 61 at 7.) However, Moshe has not alleged, nor demonstrated, that the parties had an agreement to arbitrate this matter before a religious tribunal. The fact that the parties all happen to be Orthodox Jews is immaterial to the question of whether they may be forced in to a Beis Din to recover for alleged violations of federal laws. Accordingly, Moshe's Motion to refer the matter to a Beis Din is **DENIED**.

#### B. Personal Jurisdiction (Wasserlauf Defendants)

The Wasserlauf Defendants contend this Court lacks specific personal jurisdiction over him as his alleged conduct lacked the minimum contacts with New Jersey necessary to confer jurisdiction. (ECF No. 50-1 at 9-10.) Leeder argues that it is proper for this Court to exercise personal jurisdiction over the Wasserlauf Defendants as the Complaint alleges they contacted him at his residence in New Jersey "for the purpose of participating in a scheme to defraud [him]." (ECF No. 55 at 18.)

11

Pursuant to Federal Rule of Civil Procedure 4(k), a federal district court may exercise jurisdiction over a non-resident defendant to the extent permitted by the law of the state in which it sits. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007). New Jersey's long-arm statute permits the exercise of personal jurisdiction over non-resident defendants to the fullest extent as allowed under the Fourteenth Amendment of the United States Constitution. N.J. Ct. R. 4:4-4; *Eaton Corp. v. Maslym Holding Co.*, 929 F. Supp. 792, 796 (D.N.J. 1996).

Personal jurisdiction may be either general or specific. *Silent Drive, Inc. v. Strong Indus.*, 326 F.3d 1194, 1200 (Fed. Cir. 2003). "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliation with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 119 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011)); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945). Moreover, "[s]ince *International Shoe*, 'specific jurisdiction has become the centerpiece of modern jurisdictional theory.'" *Daimler AG*, 571 U.S. at 119 (quoting *Goodyear*, 564 U.S. at 925).

There is a three-prong test to determine whether a court possesses specific personal jurisdiction over a particular defendant. *Sandy Lane*, 496 F.3d at 317. "First, the defendant must have 'purposefully directed [its] activities' at the forum." *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citation omitted). The first prong is a "threshold" inquiry. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). "Second, the litigation must 'arise out of or relate to' at least one of those activities." *Burger King*, 471 U.S. at 472 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Third, if the two prior conditions are satisfied,

a court may exercise specific personal jurisdiction should it otherwise "comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320).

"'[A] deliberate targeting of the forum'" is necessary to "meet our Circuit's requirement of purposeful availment." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018) (quoting *Sandy Lane*, 496 F.3d at 317) (rejecting a plaintiff's stream of commerce theory as sufficient to exercise specific jurisdiction over a product manufacturer targeting consumers nationwide). Additional decisions from within this Circuit make it abundantly clear that a defendant's contact with the forum state must be intentional and deliberate in order to confer personal jurisdiction upon such defendant. *See Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 334 (3d Cir. 2009); *see also J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 877-85 (2011) (plurality opinion from the Supreme Court rejecting the stream of commerce theory to establish specific personal jurisdiction). Moreover, in order for specific personal jurisdiction to be conferred, "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King*, 471 U.S. at 475); *see also Helicopteros Nacionales*, 466 U.S. at 417 (holding "[the] unilateral activity of another party or third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction").

Here, the Complaint alleges that the Wasserlauf Defendants' only purposeful conduct toward New Jersey consisted of one phone call made by someone claiming to work for Wasserlauf to Leeder. (ECF No. 1 ¶ 95.) This is insufficient grounds for the exercise of personal jurisdiction. *See Bangura v. Pennrose Mgmt. Co.*, No. 09-4017, 2010 WL 2539419, at *3 (D.N.J. June 15, 2010) (holding that sending work-related emails to the forum did not constitute purposeful availment for the purposes of personal jurisdiction); *see also InfoMC, Inc. v. Comprehensive*

*Behavioral Care, Inc.,* No. 10-4907, 2010 WL 1114360, at *8 (E.D. Pa. Mar. 30, 2012) (holding that "a few emails and telephone communications by themselves are generally not enough to establish personal jurisdiction"). As the Complaint alleges that the Wasserlauf Defendants' conduct towards New Jersey is limited only to isolated communications, this Court lacks personal jurisdiction over the Wasserlauf Defendants. Accordingly, the Wasserlauf Defendants' Motion to Dismiss for lack of personal jurisdiction is **GRANTED**.[3]

### C. RICO Violations (Counts One and Three)

Defendants contend this Court should dismiss Plaintiff's federal and state RICO claims, Counts One and Three, respectively, as *inter alia*, the Complaint fails to sufficiently allege the underlying predicate acts, fails to allege a pattern of racketeering activity, fails to allege the existence of a RICO enterprise, and relates only to a single plaintiff. (ECF No. 46-1 at 8-17; ECF No. 50 at 4-8.) Leeder argues that the Complaint adequately sets forth the predicate acts and a RICO enterprise so as to withstand the Motions to Dismiss as to both the federal and state RICO claims. (ECF No. 54 at 8-19.)

To demonstrate a violation of 18 U.S.C. § 1962(c), a plaintiff must prove:

> "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated . . . , either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity."

*United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011) (quoting *United States v. Irizarry*, 341 F.3d 273, 285 (3d Cir. 2003)).

---

[3] The Wasserlauf Defendants also argue that the RICO, NJCFA, breach of contract, book account, and unjust enrichment claims against them should be dismissed. (ECF No. 50-1.) However, because this Court has dismissed the Wasserlauf Defendants for lack of personal jurisdiction, this Court need not address the Wasserlauf Defendants' arguments concerning the specific causes of action asserted against them.

Proving a violation of 18 U.S.C. § 1962(c) "requires no more than this." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

### i.    RICO Elements

First, Defendants contend the Complaint fails to sufficiently allege the underlying predicate acts. (ECF No. 46-1 at 9-12.) Illicit racketeering activity includes "a host of so-called predicate acts, including 'any act which is indictable under . . . Section 1341 [mail fraud].'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting 18 U.S.C. § 1961(1)(B)). The Third Circuit has traditionally interpreted mail fraud statutes broadly. *See United States v. Martinez*, 905 F.2d 709, 715 (3d Cir.), *cert. denied*, 498 U.S. 1017 (1990). Fraud is "measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." *United States v. Riley*, 621 F.3d 312, 327 n.19 (3d Cir. 2010) (citation omitted). However, without "a specific fraudulent statement" identifying "the time, place, speaker, and content" of the alleged misrepresentation, a civil RICO claim asserting fraud should be dismissed. *Jaye v. Oak Knoll Vill. Condo. Owners Ass'n, Inc.*, 2016 WL 7013468, at *15 (D.N.J. Nov. 30, 2016).

Here, Leeder has adequately alleged predicate acts sufficient to state a RICO cause of action. Specifically, the Complaint alleges a pattern of wire fraud whereby the Defendants defrauded unsuspecting individuals with fake investment opportunities marked by fraudulent credit card use and abuse of money transfer services. (ECF No. 1 ¶¶ 39-71; 153.) Moreover, these allegations were pled with specificity – indicating the time, place, and manner of the fraud – so as to satisfy the standard established for fraud allegations in Rule 9(b). *See Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002) (holding that where "acts of mail fraud and wire fraud constitute the alleged predicate racketeering acts, those acts are subject to the heightened pleading standard

of Rule 9(b).")

Second, Defendants contend the Complaint fails to allege the existence of a RICO enterprise. (ECF No. 46-1 at 14-17; ECF No. 50-1 at 4-6.) An essential feature of an association-in-fact enterprise is the sharing of a "common purpose" between the members. *United States v. Boyle*, 556 U.S. 938, 948 (2009). "From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the enterprise's purpose." *Id.* at 946.[4] The Third Circuit has held that *Boyle*'s construction of the term "association-in-fact enterprise" is "capacious," "expansive," and "obviously broad." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 366 (3d Cir. 2010). Additionally, a valid RICO enterprise requires "defendants [to] conduct[] or participat[e] in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quoting 18 U.S.C. § 1962(c)).

Here, Leeder fails to allege the existence of a RICO enterprise. On the contrary, the Complaint describes the enterprise as "a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of the Complaint." (ECF No. 1 ¶ 123.) The Complaint merely recites a series of interactions between Leeder and Moshe coupled with bald, conclusory allegations that "Wasserlauf and the Wasserlauf Defendants were integral to the . . . scheme to defraud [Leeder]." (ECF No. 1 ¶ 84.) The Complaint alleges no structure of an enterprise outside of the group's conspiracy to perform the underlying criminal offenses, and such is "insufficient to plead the

---

[4] The Supreme Court has also defined an association-in-enterprise, for RICO purposes, as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

existence of an enterprise." *In re Ins. Brokerage Antitrust Litig.*, No. 04-5184, 2007 WL 1062980, at *11 (D.N.J. Apr. 5, 2007).[5]

Third, Defendants argue the RICO claims must be dismissed because the matter is a single victim case and the Complaint did not allege a pattern of racketeering activity. (ECF No. 46-1 at 13-14.) It is well-settled that allegations of a single fraudulent scheme designed to deprive a single plaintiff of property does not adequately allege a RICO violation. *See Zahl v. New Jersey Dep't of Law & Pub. Safety Div. of Consumer Affairs*, 428 F. App'x 205, 207 (3d Cir. 2011); *see also Ross v. Celtron Int'l, Inc.*, 494 F. Supp. 2d 288, 303 (D.N.J. 2007) (holding that an "isolated incident of fraud" to deprive a single victim of property did not establish a pattern of racketeering activity). Here, the Complaint asserts a RICO cause of action from a single scheme arising out of a series of transactions over a four-month period directed only at Leeder and no one else.[6] Although the Complaint alleges the Defendants engaged in the scheme to defraud other victims (ECF No. 1 ¶¶ 32, 47-48, 112), it provides no specifics of such frauds perpetrated against other victims outside of these bald, conclusory accusations. As the Complaint fails to allege a valid RICO enterprise as well as a pattern of racketeering activity sufficient to support Leeder's federal RICO claim, the federal RICO claim must be dismissed.

---

[5] Furthermore, in *Hollis-Arrington v. PHH Mortg. Corp. Corp.*, No. 05-2556, 2005 WL 3077853, at *8 (D.N.J. Nov. 15, 2005), plaintiffs alleged that "the common purpose of the enterprise was to defraud unsuspecting borrowers through fraudulent loan applications, to inflate the books, [and] to increase the amount owed on each loan," among other things. The Court ruled that where the "specific violations are the sole reason for the existence of the enterprise," then plaintiffs "have negated the existence of an enterprise separate and apart from the pattern of activity at issue here." *Id.*

[6] Notably, the "Third Circuit has faced the question of continuity and racketeering activity in several cases, each time finding that conduct lasting no more than twelve months did not meet the standard for closed-ended continuity." *Meade v. Guar. Bank*, No. 12-1559, 2013 WL 543870, at *6 (M.D. Pa. Sept. 27, 2013) (citing *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 610-11 (3d Cir. 1991)). Here, the Defendants' alleged conduct lasted only four months.

### ii.    New Jersey State RICO Claim

The "New Jersey RICO statute was and should be consistent with the federal RICO statute." *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 510 (3d Cir. 2006). "[T]he primary criterion of New Jersey's 'pattern of racketeering activity' [requirement] is 'relatedness.' That calls for the application of a broad standard involving the totality of all relevant circumstances, which may include" the continuity of the activity. *State v. Ball*, 661 A.2d 251, 265 (N.J. 1995). However, the Supreme Court of New Jersey has similarly adopted the same totality of the circumstances test used for a federal RICO claim. *Zahl*, 2009 WL 806540, at *8 (citing *Ball*, 661 A.2d at 265). As Leeder's federal RICO cause of action alleges insufficient facts to support a claim of racketeering, so too must the New Jersey state RICO claim fail. Accordingly, Defendants' Motions to Dismiss Counts One and Three is **GRANTED**.

### D.    Common Law Fraud (Count Two)

Moshe and the Shlomo Defendants argue that the common law fraud claims asserted against them should be dismissed as the Complaint fails to allege fraud with particularity. (ECF No. 46-1 at 17-19; ECF No. 61 at 9-10.) Leeder concedes that "the common law fraud count should not be directed at [the Shlomo Defendants]." (ECF No. 54 at 19.) As for his opposition to Moshe's Motion to Dismiss, Leeder argues that the Complaint "sets forth numerous details including specific conversations, dates and times," and is thus sufficient to withstand Moshe's Motion to Dismiss. (ECF No. 62 at 6.)

To state a claim for common law fraud under New Jersey law, a plaintiff must allege "(1) [the defendant made] a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) [the defendant had] an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting

damages." *Triffin v. Automatic Data Processing, Inc.*, 926 A.2d 362, 368 (N.J. Super. Ct. App. Div. 2007) (citing *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997)). The heightened pleading standard set forth in Rule 9(b) applies to New Jersey common law fraud claims. *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 524 (D.N.J. 2008) (applying Rule 9(b) to NJCFA and common law fraud claims).

The Complaint sets forth a viable common law fraud cause of action against Moshe. Leeder alleges that: Moshe made repeated, material misrepresentations concerning the purposes of his payments and the returns (ECF No. 1 ¶¶ 37-78); Moshe knew of the falsity of his statements (*id.* ¶¶ 98-102); Moshe intended Leeder to rely on his material misrepresentations (*id.* ¶¶ 63-80); Leeder relied on Moshe's misrepresentations (*id.*); and Leeder sustained damages as a result (*id.* ¶ 99.) As such, Leeder has pled a *prima facie* case for New Jersey common law fraud claim against Moshe. On the contrary, the Complaint never alleges material misrepresentations on the part of Shlomo nor his knowledge of the falsity of the statements or intention that Leeder rely on such statements. Accordingly, the Shlomo Defendants' Motion to Dismiss Count Two is **GRANTED** and Moshe's Motion to Dismiss Count Two is **DENIED**.

### E.  New Jersey Consumer Fraud Act (Count Four)

Moshe and the Shlomo Defendants contend this Court should dismiss Leeder's NJCFA claim as it fails to plead facts giving rise to the cause of action with particularity, as required by the heightened pleading standard of Rule 9(b). (ECF No. 46-1 at 17-19; ECF No. 61 at 9-10.) Leeder argues that this Court should deny the Motions to Dismiss as Moshe knowingly employed an "unconscionable commercial practice" to induce payments from him and Shlomo "admitted he was aware of the transactions" and "took no steps to correct such lies." (ECF No. 54 at 20.)

The NJCFA states, in pertinent part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; . . . .

N.J. Stat. Ann. § 56:8-2. Courts have interpreted this section to require the following three elements to state a cause of action under the NJCFA: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009) (citing *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007)).

An "unlawful practice" is defined as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

N.J. Stat. Ann. § 56:8-2. "The [NJCFA] creates three categories of unlawful practices: affirmative acts, knowing omissions, and violations of state regulations." *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 499 (D.N.J. 2009) (quoting *Vukovich v. Haifa*, No. 03-737, 2007 WL 655597, *9 (D.N.J. Feb 27, 2007) (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994))). Affirmative acts require no showing of intent on behalf of the defendant. *See Cox*, 647 A.2d at 462; *Fenwick v. Kay Am. Jeep, Inc.*, 371 A.2d 13, 16 (N.J. 1977). "Thus, a defendant who

makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence or the intent to deceive." *Vukovich*, 2007 WL 655597, at *9 (citation omitted). "In contrast, when the alleged consumer fraud consists of an omission, a plaintiff must show that the defendant acted with knowledge, thereby making intent an essential element of the fraud." *Id.*

"The third category of unlawful acts consists of violations of specific regulations promulgated under the [NJCFA]." *Cox*, 647 A.2d at 462. "In those instances, intent is not an element of the unlawful practice, and the regulations impose strict liability for such violations." *Id.* (citation omitted). Unlawful acts expressly regulated by other statutes, regulations, or rules not promulgated under the NJCFA can give rise to a NJCFA claim. *See Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 696 A.2d 546, 551-56 (N.J. 1997); *Henderson v. Hertz Corp.*, No. L-6937-03, 2005 WL 4127090, at *5 (N.J. Super. Ct. App. Div. June 22, 2006). However, the NJCFA does not create strict liability for violations of other statutes, regulations, or rules not promulgated under the NJCFA. *See Henderson*, 2005 WL 4127090, at *5.

An "ascertainable loss" is one that is "quantifiable or measurable." *Thiedemann v. Mercedes-Benz USA, LLC,* 872 A.2d 783, 793. (N.J. 2005). A "plaintiff must suffer a definite, certain and measurable loss, rather than one that is merely theoretical." *Bosland*, 964 A.2d at 749. Additionally, plaintiffs must set forth allegations sufficient to show those losses are causally connected to defendant's alleged conduct. *Id*. It is not sufficient to make conclusory or broad-brush allegations regarding defendant's conduct; plaintiff must specifically plead those facts. *Torres-Hernandez*, No. 08-1057, 2008 WL 5381227, at *7 (D.N.J. Dec. 17, 2008). This requires, for example, pleading when and to whom the alleged fraudulent statements were made. *See Dewey*, 558 F. Supp. 2d at 527.

21

Here, although Leeder has pled unlawful fraudulent conduct on the part of Moshe, an ascertainable loss, and a causal connection between the unlawful conduct and the loss, the NJCFA claim must be dismissed as Leeder does not qualify as a "consumer" for the purposes of the NJCFA. To qualify as a consumer transaction – which is not defined in the statute – the challenged services must be of the type that "are sold to the general public." *S. Broward Hosp. Dist. v. MedQuist Inc.*, 516 F. Supp. 2d 370, 399 (D.N.J. 2007). "The entire thrust of the [NJCFA] is pointed to products and services sold to consumers in the popular sense." *Arc Networks, Inc. v. Gold Phone Card Co.*, 756 A.2d 636, 637 (N.J. Law. Div. 2000). "Thus, the [NJCFA] 'is not intended to cover every transaction that occurs in the marketplace,' but, rather, 'its applicability is limited to consumer transactions which are defined both by the status of the parties and the nature of the transaction itself.'" *Cetel*, 460 F.3d at 514 (quoting *Arc*, 756 A.2d at 637)). Furthermore, New Jersey courts have been hesitant to apply the NJCFA to services provided by "learned professionals" already subject to extensive regulation. *Lee v. First Union Nat. Bank*, 954 A.2d 499, 502 (N.J. App. Div. 2008).

Here, the Complaint alleges a highly specific investment scheme, not of a nature sold to the public at large, by which Leeder offered to invest in Defendants' companies following Moshe's solicitations. (ECF No. 1 ¶¶ 35-99.) It was not alleged that these services were not marketed to the general public. Indeed, Leeder does not identify one other individual who is alleged to have been targeted by Moshe's investment scheme. Moreover, Leeder has not set forth a viable NJCFA claim, as the tender of investments does not fall within the purview of the statute. *See Stella v. Dean Witter Reynolds, Inc.*, 574 A.2d 468, 578 (N.J. App. Div. 1990) (holding that, pursuant to the legislative history of the NJCFA, "a fraud in the sale of shares of stock or other securities is not within the compass of [the NJCFA]"). Accordingly, Defendant's Motion to Dismiss Count Four

is **GRANTED**.

### F.  Breach of Contract (Count Five) and Book Account (Count Six)

The Shlomo Defendants assert Leeder's breach of contract claim and book account claim against them must be dismissed as there was no written contract between the parties, which is an essential element to sustaining a claim for breach of contract of book account. (ECF No. 46-1 at 19-21.) Leeder concedes that "the Shlomo Defendants should have been excluded from these counts and that these counts were intended only to encompass the Defendants with which [Leeder] dealt with directly." (ECF No. 54 at 21.) Accordingly, the Shlomo Defendants' Motion to Dismiss Counts Five and Six is **GRANTED**.

### G.  Unjust Enrichment (Count Seven)

The Shlomo Defendants assert Leeder's unjust enrichment claim against them must be dismissed because the Complaint alleges no quasi-contract formed between the parties and there is no allegation of an expectation of remuneration. "The unjust enrichment doctrine requires that [a] plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994); *see also Woodlands Community Ass'n, Inc. v. Mitchell*, 162 A.3d 306, 310 (N.J. App. Div. 2017).

Here, there is no allegation of any benefit conferred upon Sapphire, and the only allegation of any benefit conferred upon Shlomo is a $4,000 payment tendered on July 2, 2018. (ECF No. 1 ¶ 88.) However, the allegation in the Complaint indicates that the $4,000 paid to Shlomo was included in a $48,000 payment to Moshe, whereby Moshe paid third parties apparently to satisfy debts he owed. (*Id.*) Moreover, the Complaint contains no allegation that there was any expectation of remuneration from the Shlomo Defendants pursuant to the Leeder's July 2, 2018 payment.

Accordingly, the Shlomo Defendants' Motion to Dismiss Count Seven is **GRANTED**.

### IV.    CONCLUSION

For the reasons set forth above, the Shlomo Defendants' Motion to Dismiss is **GRANTED**, the Wasserlauf Defendants' Motion to Dismiss is **GRANTED**, Moshe and Chaviva's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**, and Moshe and Chaviva's Motion to Transfer the Matter to a Beis Din is **DENIED**.

**Date: June 28, 2019**                    */s/ Brian R. Martinotti*

                                   **HON. BRIAN R. MARTINOTTI**
                                   **UNITED STATES DISTRICT JUDGE**